# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT COLUMBUS

HOWARD E. MARTIN, III,

     Petitioner,      :   Case No. 2:22-cv-04423

 - vs -              Chief Judge Sarah D. Morrison
                  Magistrate Judge Michael R. Merz

TIM SHOOP, WARDEN,
 Chillicothe Correctional Institution,

              :
      Respondent.

---

## REPORT AND RECOMMENDATIONS

---

This habeas corpus case, brought *pro se* by Petitioner Howard Martin under 28 U.S.C. § 2254, is before the Court for decision on the merits.  Relevant pleadings are the Petition (ECF No. 14), the State Court Record (ECF No. 31), the Warden's Return of Writ (ECF No. 32), and Petitioner's Reply (ECF No. 35).  The Magistrate Judge reference in this case has recently been transferred to the undersigned to help balance the Magistrate Judge workload in the District (ECF No. 55).

**Litigation History**

On October 3, 2014, the Hamilton County Grand Jury indicted Martin on one count of Attempted Murder, two counts of Felonious Assault, and one count of Tampering with Evidence.

1

Despite initial concerns on the question of his competency to stand trial and some attempts at treatment, Martin was found competent on October 21, 2015, on January 20, 2016, and again on September 9, 2016.

After a number of *pro se* motions to dismiss and fruitless attempts to appeal, Martin was tried by a jury which found him guilty on all counts (Verdicts, State Court Record, ECF No. 31, Ex. 47). He was sentenced to an aggregate term of fourteen years imprisonment.

The First District Court of Appeals found the following relevant facts:

> [¶5] Around 9:00 a.m. on September 26, 2014, Michael DiPuccio was standing outside the William Howard Taft building ("Taft building") smoking a cigarette when he was hit from behind on the side of his face and the top of his head. DiPuccio turned and saw a shorter black man in front of him holding a hunting knife. The man tried to stab him, but missed. DiPuccio began walking backwards. The man stabbed at him again, and this time DiPuccio felt the tip of the knife on his chest. DiPuccio ran into the street to avoid being stabbed again. Once there, he turned to see if the man was still chasing him. But the man had turned, pulled up the hood on his sweatshirt, and begun walking in the opposite direction. DiPuccio's face and head were bleeding profusely. He walked back near the doors of the Taft building and sat down on the sidewalk to await emergency assistance.
>
> [¶6] At the time of the attack, law students Danyel Rickman and Terry Cannon had been walking across the street and were stopped at an intersection waiting for the traffic light to turn green. Cannon heard a man yell, and saw two men fighting in front of the Taft building. He told Rickman what he had seen, and as they watched the two men, they realized it was not a fight, but a knife attack. A shorter black man was attacking an older white man with a knife. From their vantage point, they could see the attacker's face and his clothing. Rickman called 911 and described the attacker as a black male wearing a skull cap and black clothing. She indicated that he was holding a large butcher knife. They observed the attacker cut the white man. The white man kept retreating and ended up running into the intersection near where they were standing. The black man fled from the scene. When traffic cleared, they walked over to the injured man. His face was slashed and he was bleeding from his side. They stayed at the scene to provide the police with a description of what they had seen.

[¶7] Kelly Johnson, an attorney, was walking near the Taft building on his way to a court appearance, when he heard voices and his attention was drawn to the front of the Taft building. He saw a taller white man with white hair and a shorter black man wearing a black hoodie, black pants, and black shoes. The black man pulled out a large butcher knife and started slashing at the face of the white man. He cut the white man's face several times and he stabbed at the man's chest and stomach. Johnson called 911 to report the incident. While talking with the 911 operator, Johnson continued to observe the attacker as he left the scene. Johnson told the 911 operator that the security officers in the Taft building had exited from the building and had followed the attacker down an alley next to the building. Johnson followed behind them yelling, "That's the person, that's the guy who did it." He then saw the officers take the man into custody.

[¶8] Melynda Machol, an assistant Hamilton County prosecuting attorney, was parking her vehicle in the parking lot behind the Taft building, when she saw a black man dressed in all black clothing coming from the alley next to the parking lot. He stood near a dumpster at the back of the parking lot for a few seconds and looked out into the rest of the parking lot. As she pulled into her parking spot and gathered her things, he walked toward her car. When she opened her car door, he crouched down near the right front of her vehicle. As she walked by the front of her vehicle, the man stood back up and moved to the rear of her vehicle.

[¶9] Almost simultaneously, Machol saw security officers coming from the Taft building and the alley. Johnson, whom she knew, was also coming down the alley. The officers were screaming, and Johnson was yelling, "That's him, that's him." The security officers moved toward the man that had been crouching near her vehicle. At this point, the man had moved from her car to the center of the parking lot. The security officers ordered him to the ground and he complied. He was taken into custody with the assistance of other police officers that had arrived on the scene. Johnson moved closer to where the police had stopped the man and told the 911 operator that the police had apprehended the man who had committed the knife attack.

[¶10] Cincinnati police officer Andy Brown, who was in uniform and on patrol, responded to the scene of the attack. When he arrived, Martin had already been taken into custody and placed in the back seat of a police cruiser. Officer Brown separately approached Rickman and Cannon, who had remained on the scene, and interviewed them. Officer Brown asked them if they could identify the attacker. Rickman and Cannon indicated they had seen the

3

attacker's face and could identify him. Officer Brown brought Rickman and Cannon individually to the police cruiser where Martin was sitting handcuffed and asked if they recognized him. Within 15-20 minutes of the attack, each identified Martin as the attacker based on his face and his clothing.

[¶11] Johnson had left the scene to attend a court appearance. Thirty minutes after the attack, he returned to the scene and approached a police officer. He told the officer that he had witnessed the attack and had contacted 911 to report the incident. The police officer asked Johnson if he could identify the attacker. When Johnson responded affirmatively, the officer walked him to a police cruiser, opened the door, and asked him if the person seated in the car was the person who had committed the attack. Johnson identified the man in the cruiser as the attacker. Johnson testified his identification of Martin had been based on watching him commit the attack and the police apprehend him immediately after the attack. At trial, Johnson, Cannon, and Rickman identified Martin as the perpetrator of the knife attack.

[¶12] Jeff Caldwell, a Hamilton County deputy bailiff, was providing security inside the front door of the Taft building, when a man entered and stated that someone was being stabbed down the street. Caldwell and his partner, Rick Ideker, proceeded out the front door of the building toward the alley next to the building. They proceeded at a fast walk through the alley to the parking lot behind the building. They caught up with the attacker in the parking lot and ordered him to the ground. Caldwell identified Martin as the person he had apprehended.

[¶13] Dick Rusza, an office supervisor with the Hamilton County Sheriff's Office, was in charge of the property room at the Hamilton County Justice Center the day Martin was arrested. He testified that when Martin was processed he was wearing a black jacket, black pants, and a black shirt. Rusza identified a property intake form and a photo of Martin wearing a black hooded sweatshirt. He further testified that Martin's clothing had been returned to him upon his transfer to another facility.

[¶14] When police searched the area where Martin had been arrested, they had found a small knife propped against a mattress near the dumpster, a larger butcher knife underneath Machol's vehicle, and a black skull cap in the alley. At trial, Rickman identified the skull cap as being consistent with the hat she had seen the attacker wearing. Rickman, Cannon, Johnson, and DiPuccio

4

identified the larger knife that had been recovered under Machol's car as the knife that the attacker had used to cut and stab DiPuccio.

[¶15] Robin Upchurch, the investigating police officer, testified that she had ordered the two knives to be tested for fingerprints. Derek Foote, the criminalist who had performed the fingerprint testing, testified that he did not obtain any useable fingerprints from the knives, and that once he had processed the knives for fingerprints, he could not process them for DNA evidence.

[¶16] DiPuccio testified that he had received 16 stitches to his face and head, and he had sustained a puncture wound to his chest. His medical records were admitted into evidence. Martin did not testify or present any evidence. The jury found Martin guilty of all the charged offenses.

*State v. Martin*, 2018-Ohio-1061 (Ohio App. 1st Dist. March 23, 2018). Having found these facts,

the First District affirmed the conviction (Judgment, State Court Record, ECF No. 31, Ex. 56).

The Ohio Supreme Court declined to exercise jurisdiction over a further appeal. *Id.* at Ex. 59.

Martin has filed a number of unsuccessful post-trial motions for new trial, to vacate, and

for relief from judgment. Respondent reports that Martin filed a state court habeas corpus action

on December 16, 2022, which the State has moved to dismiss (Return, ECF No. 32, PageID 1495).

Petitioner filed his Petition in this Court on April 10, 2023, pleading one ground for relief:

> **Ground One**: A Violation of Fifth Amendment of the United States Constitution
>
> **Supporting Facts:** The Court Appointed Attorney who the Judge wouldn't allow the Defendant to fire did not present the exculpatory evidence into discovery.

(Doc. #: 14, PageID #: 117).

# Analysis

## Statute of Limitations

As demonstrated in the Warden's Return of Writ, the one-year statute of limitations enacted by the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA") and codified at 28 U.S.C.§ 2244(d) began to run May 8, 2018, the last day on which Martin could have filed a timely appeal to the Ohio Supreme Court.  It was tolled while his motion for a delayed appeal was pending before that court (June 20-August 15, 2018, a total of fifty-six days).  Thus the statute had an additional 322 days to run when tolling ceased on August 15, 2018, and therefore expired July 3, 2019.  Martin's filing is almost four years late and thus is barred by the statute of limitations.

## Violation of Habeas Rule 2

Martin claims his conviction is the result of his attorney's failure to submit exculpatory evidence.  Although Martin asserts this is a violation of the Fifth Amendment, because he is proceeding *pro se*, the Court construes this claim liberally as a claim of ineffective assistance of trial counsel which would arise under the Sixth Amendment, which guarantees effective assistance of counsel.  *Powell v. Alabama*, 287 U.S. 45 (1932)(capital cases); *Gideon v. Wainwright*, 372 U.S. 335 (1963)(felony cases); *Argersinger v. Hamlin,* 407 U.S. 25 (1972)(misdemeanor cases where imprisonment is a possibility); *Alabama v. Shelton,* 535 U.S. 654 (2002)(even if sentence is suspended).

Martin's Petition as filed violates Habeas Rule 2 because it gives no hint of what exculpatory evidence was available to be presented.

**Procedural Default**


Assuming the supposed exculpatory evidence is the failure of witness Kelly Johnson to identify the "grey bag" Martin claims he was carrying at the time of the offense, Respondent asserts this claim is procedurally defaulted because Martin raised it in a motion for new trial but did not appeal from denial of that motion.

> [A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule. E.g., *Beard v. Kindler*, 558 U.S. 53, 55, 130 S.Ct. 612, 175 L.Ed.2d 417 (2009). This is an important "corollary" to the exhaustion requirement. *Dretke v. Haley*, 541 U.S. 386, 392, 124 S.Ct. 1847, 158 L.Ed. d 659 (2004). "Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address" the merits of "those claims in the first instance." *Coleman* [*v. Thompson*], 501 U.S. [722,] 731-732, 111 S.Ct. 2546, 115 L.Ed.2d 640 [(1991)]. The procedural default doctrine thus advances the same comity, finality, and federalism interests advanced by the exhaustion doctrine. See *McCleskey v. Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).

*Davila v. Davis*, 582 U.S. 521, 527 (2017). "[A] federal court may not review federal claims that were procedurally defaulted in state courts." *Theriot v. Vashaw*, 982 F.3d 999 (6th Cir. 2020), citing *Maslonka v. Hoffner*, 900 F.3d 269, 276 (6th Cir. 2018) (alteration in original) (quoting *Davila v. Davis*, 582 U.S. 521, 527(2017)). *Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir. 2002).

Because Martin did not appeal denial of relief on this issue, it is procedurally defaulted.


**Issues Raised in Martin's Reply (Amended Writ)**


On August 28, 2023, Martin filed a document labeled "Amended Writ of Habeas Corpus"

which the Clerk docketed as his reply (ECF No. 35).  That was consistent with Magistrate Judge

Litkovitz's Show Cause Orders)(ECF Nos. 34 and 36) and Petitioner's Response to those Orders

(ECF No. 37).

In his Reply Martin takes issue with the trial testimony of State's witness Kelly Johnson[1]

that he never lost sight of Martin at the time of the crime.  Martin's theory is that he was

carrying/wearing a grey bag at the time of the crime, the same grey bag that is shown on the

Sheriff's property receipt and that if Johnson had been paying attention, he would have seen the

grey bag.

Because defense counsel at some time during the proceedings expressed acceptance of

Johnson's credibility, Martin suggests defense counsel had a disqualifying conflict of interest.  Not

so.  The criminal defense bar in Southern Ohio is sufficiently small that personal acquaintance of

attorneys is likely; the Magistrate Judge himself knows Attorney Johnson in his professional

capacity.

Even if the property receipt with the grey bag had been entered in evidence, it would likely

have made no material difference in the outcome.  Attorney Johnson's testimony was sufficiently

lengthy and detailed that a discrepancy on this one point would likely have made no difference.

In his Reply, Martin seeks to raise again his claim that his pre-trial identification was

suggestive.  That claim is not pleaded in the Petition.

Also in his Reply, Martin claims he is actually innocent so as to excuse any procedural

default (ECF No. 35, PageID 1556, et seq.).  His claim seems to be based on the fact that he never

agreed to a plea deal and has proclaimed his innocence throughout.  That is not sufficient.  The

controlling precedent on this point is now the Supreme Court's decision in *McQuiggin v. Perkins*,

---

[1] Martin refers to this witness as "Winston Kelly Johnson."  Attorney Johnson is a long-standing member of the bar
of this Court who is called "Kelly Johnson" by court personnel.  This Report uses Attorney Johnson's chosen name.

569 U.S. 383 (2013).

> [A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U. S., at 329, 115 S. Ct. 851, 130 L. Ed. 2d 808; see *House*, 547 U. S., at 538, 126 S. Ct. 2064, 165 L. Ed. 2d. 1 (emphasizing that the *Schlup* standard is "demanding" and seldom met). And in making an assessment of the kind *Schlup* envisioned, "the timing of the [petition]" is a factor bearing on the "reliability of th[e] evidence" purporting to show actual innocence. *Schlup*, 513 U. S., at 332, 115 S. Ct. 851, 130 L. Ed. 2d. 808.
>
> * * *
>
> [A] federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown.

*McQuiggin v. Perkins*, 569 U.S. 383, 386-87 (2013).  Martin has submitted no new evidence of the quality required by *Schlup* which persuades the Court that no rational juror would have voted to convict.

**Conclusion**

Based on the foregoing analysis, the Magistrate Judge respectfully recommends this case be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, it is also recommended that Petitioner be denied a certificate of appealability and that the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should not be

permitted to proceed *in forma pauperis*.

May 27, 2025

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Because this document is being served by mail, three days are added under Fed.R.Civ.P. 6, but service is complete when the document is mailed, not when it is received. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. #